IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

WOLF APPLIANCE, INC.,

OPINION AND
ORDER

            Plaintiff,

09-cv-697-vis[1]

     v.

VIKING RANGE CORP.,

            Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

     Plaintiff Wolf Appliance, Inc. contends that defendant Viking Range Corp.'s use of red knobs on its ranges and rangetops constitutes federal trademark infringement in violation of 15 U.S.C. §§ 1114-1118 and unfair competition in violation of 15 U.S.C. § 1125(a) and the common law.  In response to plaintiff's complaint, defendant filed an answer and counterclaims, seeking a declaration that plaintiff's trademark is invalid and that defendant did not infringe the trademark and an order canceling the registration of plaintiff's trademark under 15 U.S.C. § 1119.  Now before the court is plaintiff's motion for a

---

[1]  The parties have declined jurisdiction of the magistrate judge in this case.  Because no Article III judge has been assigned, I am assuming jurisdiction over this case to resolve the parties' present disputes.

preliminary injunction, dkt. #5, in which plaintiff seeks an order that would enjoin defendant from advertising, promoting, offering or selling red knobs while the case is pending.  An evidentiary hearing on the motion was held on February 5, 2010.  After considering the facts and arguments presented in the parties' briefs and at the hearing, I conclude that plaintiff has shown a reasonable likelihood of prevailing on its trademark infringement claims.  I conclude also that plaintiff has shown a likelihood of irreparable harm, that the balance of the harms favors plaintiff and that the public interest would not be disserved by a grant of an injunction.  Jurisdiction for plaintiff's trademark infringement and unfair competition claims is present under 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) because this is a matter arising under the Trademark Laws of the United States, §§ 15 U.S.C. 1051-1127.

Before turning to the merits of plaintiff's motion, an initial evidentiary matter requires attention.  Both parties have submitted declarations from distributors and retailers on the question whether plaintiff has successfully developed strong consumer recognition for its red knobs.  The declarations plaintiff submitted show that some retailers and consumers associate red knobs with plaintiff's ranges.  Predictably, the declarations defendant submitted show that some retailers and consumers do not associate red knobs with plaintiff's ranges.  Many of the declarations include vague statements or generalizations that lack foundation, such as  "[c]ustomers associate the red knobs with Wolf . . .," Decl. of Rick

2

Simler, dkt. #13, or "customers do not associate red knobs with Wolf," Decl. of Rich Super, dkt. #44.   Because such statements lack foundation and have minimal evidentiary value, I will disregard these statements and consider only the declarations that include specific statements or incidents from retailers with personal knowledge of the matters related in their declarations.   Also, plaintiff has submitted online postings from internet websites and bulletin boards purportedly from consumers associating red knobs with plaintiff's appliances. These statements will be disregarded as well.   Plaintiff has not shown that these statements were made by actual range or rangetop consumers.

From the plaintiff's proposed findings of fact and the record, I find the following facts to be material and undisputed for the purpose of deciding this motion.

## UNDISPUTED FACTS

### A.   <u>Parties</u>

Plaintiff Wolf Appliance, Inc. is a Wisconsin corporation with its principal place of business in Madison, Wisconsin.   Defendant Viking Range Corp. is a Mississippi corporation with its principal place of business in Greenwood, Mississippi.   The parties are both manufacturers of "high-end" cooking appliances and sell their products throughout the United States, including Wisconsin.   The appliances at issue are ranges and rangetops.   The parties' ranges and rangetops are sold through kitchen designers, exclusive distributors and

3

in retail appliance stores.

## B. Plaintiff's Use and Marketing of Red Knobs

Plaintiff's corporate predecessor, Wolf Range, LLC, began selling commercial ranges with red knobs in approximately 1933. In approximately 1985, Wolf Range expanded into the residential kitchen market by creating Wolf Gourmet. All of Wolf Gourmet's residential range and rangetop products used red knobs. Wolf Gourmet's product catalog stated: "Knob appeal. This is, perhaps, the first thing one notices about a Wolf product. The red knobs serve as a reminder of its distinctive nature."

In 2000, Sub-Zero Freezer Company acquired Wolf Gourmet and continued to sell ranges and rangetops with red knobs for residential kitchen use. Wolf Gourmet later became a separately incorporated entity, Wolf Appliance, Inc., plaintiff in this case. Through all of its various corporate iterations, "Wolf" has continuously marketed and sold ranges and rangetops with red knobs.

In 2006, plaintiff filed an application for federal trademark registration for its red knobs with the U.S. Patent and Trademark Office. In its application, plaintiff stated that the use of red knobs in residential ranges and rangetops had been "substantially exclusive" since the year 2000. The trademark examiner twice required plaintiff to provide additional information proving that its red knobs were not merely an "ornamental feature" and had

4

acquired secondary meaning.  In response, plaintiff submitted third party media sources that stated or implied that red knobs are uniquely associated with Wolf ranges and rangetops. For example:

- In 2001, an article in <u>The New York Times</u> stated:  "Wolf [is] known for its red knobs."

- In 2000, an article in the <u>Albuquerque Journal</u> stated:  "Some of them will leave with a Viking but others select a Wolf, with its distinctive red knobs . . . Wolf is known for its distinctive red knobs."

- In 2001, an article in <u>The Calgary Herald</u> stated:  "Here's the literature on Wolf's Gourmet stoves . . . Look for the red knobs . . . ."

- In 2002, an article in <u>The San Francisco Chronicle</u>, discussing Sub-Zero's acquisition of Wolf stated:  "But where are the Red Knobs? . . . Sub-Zero has kept the Wolf name, and the heavy iron models with the red knobs are still being made."

- In 2002, an article on <u>appliancedesign.com</u> stated:  "The company's classic red knobs . . . ."

- In 2005, an article on <u>adweek.com</u> stated:  "Wolf's signature red knobs" are featured in Wolf television advertisements.

- In 2006, an article in <u>Madison Magazine</u> stated:  "With its signature red knobs and cobalt blue oven interiors, Wolf is a familiar choice for cooktops, ovens and freestanding ranges in upscale kitchens."

- A 2006 article on <u>Kitchens.com</u> entitled <u>Wolf vs. Viking: What's the Difference Between Wolf and Viking?</u>, noted:  "One thing your money can't get with Viking:  Wolf's trademark red knobs, considered a status symbol in some circles."

- In 2007, an article on <u>appliance.com</u> stated:  "With their iconic red knobs,

Wolf ranges are the stuff of dreams for many home chefs."

- In 2007, an article in the Consumer Guide stated: "Constructed of stainless steel, this model features Wolf's signature, recognizable red knobs . . . ."

- In 2008, an article in Bay City Times wrote: "Hand-crafted in Madison, Wis., the units are recognizable by their signature red knobs."

On August 12, 2008, the Trademark Office granted the trademark registration. Specifically, the trademark U.S. Registration No. 3,485,025 was registered under 15 U.S.C. § 1052(f), for "red knob or knobs." The trademark applies to "[d]omestic gas and electric cooking appliances, namely, ranges, dual-fuel ranges, cooktops, and barbeque grills."

Since 2000, plaintiff has sold more than 325,000 units bearing red knobs, generating over $800 million in revenue. Since 2001, plaintiff has spent more than $41 million on advertising and other promotions featuring red knob ranges and rangetops. Plaintiff's product catalogs include phrases such as "distinctive red knobs" and describe those knobs as an "exclusive Wolf feature." In 2006 and 2007, plaintiff placed a four-page advertisement in magazines that features a red knob on the first page. In an article describing plaintiff's first television advertisement, Brandweek.com wrote that "[t]he camera shows close-ups of the range and its signature red knobs." In 2009, myneworleans.com wrote: "Wolf's Dual Fuel Range . . . . It's also the brand with the shiny red knobs."

Some appliance distributors, dealers and ultimate consumers associate red knobs with plaintiff's ranges and rangetops and some do not. Mark Rouillard, the general manager and

6

co-owner of Central Furniture & Appliance in Sanford, Maine, has had customers come into his store on three separate occasions and state, "I want that range with the red knobs." Stephen Weiner, a sales manager for Abt Electronics in Lakeview, Illinois, was recently speaking with a customer who wanted to purchase a Wolf range.  When Weiner asked the customer whether she wanted red knobs or black knobs on the range, she said, "Aren't red knobs kind of like Wolf's trademark?"  Weiner told the customer that she was correct and the customer requested red knobs for her range.  Other distributors and dealers have never had or do not recall a customer ever requesting "the range with red knobs" or otherwise associating red knobs with Wolf ranges.

When Sub-Zero acquired Wolf Gourmet, Sub-Zero began selling, displaying and marketing Wolf residential ranges with black knobs.  Black knobs are an option for plaintiff's gas ranges, dual fuel ranges, open burner range tops, sealed burner range tops and barbeque grills.  In the case of gas ranges, open burner range tops, sealed burner range tops and barbeque grills, plaintiff ships all the products to distributors with red knobs already on them and customers must order a black knob kit to change the color.  In the case of dual fuel ranges, the products are shipped to distributors without knobs, and the distributors attach red or black knobs as the customer chooses.  Plaintiff and its dealers display, advertise, market and promote ranges and rangetops with black knobs.  In the past few months, representatives of defendant visited approximately 30 retailers that sold Wolf ranges.  Of the

7

30 retailers, approximately 75% displayed Wolf ranges with black knobs.  On its website, plaintiff displays images and videos of ranges with black knobs for its four dual-fuel range models.  Its website states, "Choose black knobs, or let everyone know it's a Wolf with our distinctive red knobs."  Plaintiff's ranges and rangetops with black knobs have been featured in kitchen design magazines.  Plaintiff does not instruct retailers which color knobs to display on their ranges and rangetops.  Ranges and rangetops with black knobs account for less than 30% of plaintiff's range-related sales.

### C.  Other Range Manufacturer's Use of Red Knobs

Most manufacturers of professional and residential kitchen ranges and rangetops sell their products with either black or stainless steel knobs, although some manufacturers sell their products with colored knobs also.  Manufacturers including Viking, Vulcan, Wolf Commercial Equipment, Capital Cooking Equipment, O'Keefe & Merritt, Wedgewood and DCS have sold ranges with red knobs.  Viking produced a range with red knobs from 1988 to 1993.  The Vulcan, Wolf Commercial Equipment and DCS ranges are sold exclusively in the commercial market, which consists primarily of restaurants, rather than residential market that is the subject of plaintiff's trademark.  The O'Keefe & Merrit and Wedgewood ranges have not been sold for several years and Capital Cooking is a minor player in the residential range market, with limited dealers and limited sales.  Some retailers carry both

8

residential and commercial ranges, but plaintiff's ranges are typically sold by dealers who focus on the residential market.

## C.  Defendant's Red Knob Kits

Defendant is plaintiff's chief competitor in the high-end residential range and rangetop market.  Both companies offer stainless steel ranges that feature "heavy-duty oven handles" and "heavy-duty cooking grills."  All Viking distributors have exclusive dealership agreements.  Thus, a distributor will never have a Wolf range and a Viking range sitting side-by-side in the same distributor showroom.  However, some appliance retailers sell both Wolf and Viking ranges and rangetops in the same store.  For example, two American TV and Appliance stores in Madison, Wisconsin, display Wolf and Viking ranges and rangetops in the same showroom.  Retailers who carry both Viking and Wolf ranges may display the ranges in separate "vignettes" or built-in-kitchens that display only one brand and that are separate and distinct from the rest of the dealer sales floor.  Some of these vignettes have prominent signs that denote the manufacturer's name; others do not.  Some dealers, such as Abt Electronics and Appliances in Glenview, Illinois, display Wolf and Viking ranges side-by-side in long rows of ranges.

Beginning in January 2008, defendant offered "custom ranges" that allow customers to choose from among 24 different colors for ranges and rangetops, including "apple-red."

When the custom ranges were first shipped in 2008, they were installed and shipped with black knobs as standard.  In connection with designing the custom ranges, defendant investigated the possibility of offering knobs in a variety of colors.  "Input from the field" indicated that consumers were interested in having the option to purchase a number of different colored knobs, including green, blue, red, brass and champagne.  In 2009, defendant began to ship custom ranges with stainless steel knobs as standard and with a black knob kit available as an optional accessory kit.  In October 2009, defendant began to offer a red knob accessory kit.  Defendant does not offer any other knob colors besides stainless steel, black, red and white (the white knobs are standard on white ranges).  The red knob kits cannot be purchased through defendant's website.  Instead, defendant's website directs customers to contact a Viking dealer to purchase a knob kit.  (The parties dispute whether defendant ever displayed photographs on its website that pictured red knobs on stainless steel ranges.  Plaintiff avers that when defendant began offering red knob kits, defendant's website displayed close-up photos of the red knobs on stainless steel ranges and that defendant removed the pictures by agreement of the parties.  Defendant denies ever displaying such photographs on its website.)

In October 2009, a Viking distributor in Lakeview, Illinois displayed a Viking stainless steel range with red knobs during an industry event for dealers in its showroom with a poster above it stating:  "WHO'S AFRAID OF THE BIG BAD WOLF?"  The poster

10

advertised the availability of stainless steel, black or red knobs for Viking ranges. Defendant did not encourage the distributor to create the poster and was not aware that the distributor had displayed the poster or the stove with red knobs. A Viking stainless steel range with red knobs was also recently on display at a Viking distributor's showroom outside Atlanta, Georgia for approximately one month.

(The parties disagree about how similar in appearance plaintiff's and defendant's red knobs are. Defendant avers that the color of the red knobs used on its ranges is brighter than the color of plaintiff's red knobs, and designed to match its "apple-red" custom range.) Both plaintiff's and defendant's red knobs have graduated "high" and "low" temperature markings printed on the side.

OPINION

Plaintiff has a number of hurdles to overcome before it can obtain preliminary injunctive relief. It must demonstrate as a threshold matter (1) some likelihood of success on the merits of its trademark infringement claim; and (2) that there is no adequate remedy at law and it will suffer irreparable harm if the injunction is denied. AM General Corp. v. DaimlerChrysler Corp., 311 F.3d 796, 803 (7th Cir. 2002); Abbott Laboratories v. Mead Johnson & Co., 971 F.2d 6, 11 (7th Cir. 1992). If plaintiff satisfies these two elements, it must then show (3) that the harm it would suffer if denied an injunction would outweigh

11

the harm defendant would suffer if the injunction issues; and (4) the public interest (non-parties) would not be affected negatively by an issuance of an injunction.  <u>Abbot Laboratories</u>, 971 F.2d at 11-12.  Each of these showings presents its own obstacles.

## A. <u>Likelihood of Success</u>

To meet the first requirement for obtaining a preliminary injunction, plaintiff must be able to show that it has a "better than negligible" chance of showing that defendant's use of red knobs violates plaintiff's trademark rights so that injunctive relief is justified.  <u>Ty, Inc. v. Jones Group, Inc.</u>, 237 F.3d 891, 897 (7th Cir. 2001).  Plaintiff is not required to show a likelihood of success beyond all doubt.  <u>Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of American, Inc.</u>, 549 F.3d 1079, 1096 (7th Cir. 2008); <u>see also International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.</u>, 846 F.2d 1079, 1086 (7th Cir. 1988) ("[T]he plaintiff's burden at the preliminary injunction stage is slight.")

To prevail on a claim of trade dress infringement, plaintiff must show that (1) its trade dress is protectible because it is either inherently distinctive or has acquired secondary meaning and (2) the similarity of the defendant's trade dress causes a likelihood of confusion on the part of consumers as to the source or affiliation of the products.  <u>Thomas & Betts Corp. v. Panduit Corp.</u>, 138 F.3d 277, 291 (7th Cir. 1998).  Also, an alleged mark is not protectible as a trademark if it the defendant can show that the trade dress is functional.

12

Badger Meter, Inc. v. Grinnell Corp., 13 F.3d 1145, 1151 (7th Cir. 1994).

      In this case, plaintiff has shown a reasonable likelihood of success on its claims.  The evidence weighs heavily in favor of a finding that red knobs have acquired secondary meaning.  It is a closer question whether defendant's use of red knobs will likely confuse consumers, but in light of the evidence, plaintiff has a better than negligible chance of establishing that defendant's use of red knobs creates the appearance of an affiliation between plaintiff and defendant, leading to consumer confusion.

### 1.  Secondary meaning

      Trade dress has secondary meaning if there exists "a mental association in buyers' minds between the alleged mark and a single source of the product."  Packman v. Chicago Tribune Co., 267 F.3d 628, 641 (7th Cir. 2001) (citing 2 McCarthy, Trademarks and Unfair Competition, § 15:5, at 15-9 (4th ed. 2001)); see also Qualitex, 514 U.S. at 163 (secondary meaning acquired when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself").  Secondary meaning arises when a mark "has been used so long and so exclusively by one company in association with its goods or services that the word or phrase has come to mean that those goods or services are the company's trademark."  Packman, 267 F.3d at 641.  The fact that the Trademark Office has issued a federal trademark registration for plaintiff's red

knob mark creates a presumption that the mark is valid and that plaintiff has established secondary meaning.  15 U.S.C. §§ 1057(b) and 1115(a); <u>Liquid Controls Corp. v. Liquid Control Corp.</u>, 802 F.2d 934, 936 (7th Cir. 1986) (registration of mark "entitles the plaintiff to a presumption that its registered trademark is not merely descriptive or generic, or, if merely descriptive, is accorded secondary meaning").  Defendant may overcome this presumption with evidence that the mark lacks secondary meaning, <u>Packman v. Chicago Tribune Co.</u>, 267 F.3d 628, 639 (7th Cir. 2001), or by showing that plaintiff's trade dress is functional.  <u>Eco Manufacturing LLC v. Honeywell International, Inc.</u>, 357 F.3d 649, 653 (7th Cir. 2003).

The Court of Appeals for the Seventh Circuit considers the following seven factors in determining whether a mark has acquired secondary meaning:  (1) direct consumer testimony and consumer surveys; (2) exclusivity, length and manner of use; (3) amount and manner of advertising; (4) amount of sales and number of customers; (5) established place in the market; and (6) proof of intentional copying.  <u>Echo Travel, Inc. v. Travel Associates, Inc.</u>, 870 F.2d 1264, 1267 (7th Cir. 1989).  The existence of secondary meaning is a question of fact, <u>Bishops Bay Founders Group, Inc. v. Bishops Bay Apartments, LLC</u>, 301 F. Supp. 2d 901, 909 (W.D. Wis. 2003).

a.  Direct consumer testimony and consumer surveys

14

In this case, the direct evidence of consumers associating red knobs with plaintiff's ranges and rangetops is minimal. Neither party has presented evidence of consumer surveys. Plaintiff's evidence establishes only that there are a few dealers and distributors who associate red knobs with Wolf and have interacted with customers who associate red knobs with Wolf. Defendant's evidence establishes that there are a few distributors or dealers who do not associate red knobs with Wolf and do not recall a customer walking into their store to request "the range with red knobs" or recall customers associating red knobs with Wolf. This minimal evidence regarding consumer association of red knobs does not disturb the presumption in favor of the validity and secondary meaning of plaintiff's trade dress.

b. Exclusivity, length and manner of use

As to the length and exclusivity of use, there is no dispute that plaintiff has continuously used the red knobs on its residential ranges since at least 2000, if not earlier. Also, the evidence favors a finding that plaintiff's use of red knobs on ranges and rangetops has been nearly exclusive of other manufacturers in the residential market. Although defendant has provided evidence that other range and rangetop manufacturers have used red knobs, plaintiff has provided evidence suggesting that these manufacturers have either not produced red knobs since 2000 or do not compete significantly in the same market with plaintiff.

15

When evaluating the manner of use, the court considers whether the primary significance of the red knobs is to identify plaintiff as the source of red-knobbed ranges and rangetops.  Defendant argues that plaintiff's use of red knobs is primarily decorative and functional, not as source identification.  However, plaintiff has provided significant evidence from several third-party media outlets, including The New York Times and The San Francisco Chronicle that identifies red knobs as plaintiff's trademark, not simply as a decorative part of plaintiff's products.  In particular, media coverage describing plaintiff's red knobs as "signature," "trademark" and "iconic" suggests that the red knobs have acquired secondary meaning as a source identifier.

c.  Amount and manner of advertising

Advertising that "encourages consumers to identify the claimed trade dress with the particular producer is some evidence of secondary meaning."  Thomas & Betts, 138 F.3d at 292 ("advertising which prominently features the oval-shaped heads of [plaintiff's] ties could [] function to draw consumers' attention to the shape and to associate it with [plaintiff]"); International Kennel Club of Chicago, 846 F.2d at 1086 (extensive advertising directed at target consumers supported finding of secondary meaning).  Plaintiff points to the approximately $41 million it has spent advertising and promoting products bearing its red knobs and contends that its advertising has consistently given prominent placement to the

16

red knobs.  Although this total advertising budget was not targeted exclusively at promoting the red knob trade dress or developing its source identification properties, plaintiff's advertisements do tend to display red knobs and have referred to the red knobs as "exclusive" and a "distinctive Wolf feature."  The third party media sources that have made the connection between red knobs and plaintiff are evidence that plaintiff's advertising has worked, at least to some extent.  Also, the fact that defendant's own Lakeview distributor created a poster that associated red knobs with Wolf ranges shows that plaintiff's advertising has also worked on some industry observers.  Finally, although defendant argues that plaintiff's use and marketing of black knobs undermines plaintiff's red knob trade dress claim, defendant does not dispute that black knobs are one of the most common knobs sold in the residential kitchen range industry, and yet account for less than 30% of plaintiff's range sales.  Moreover, plaintiff's website advertises its black knobs by stating:  "Choose black knobs, or let everyone know it's a Wolf with our distinctive red knobs."

d.  Amount of sales and number of customers

A high volume of sales can support a finding of secondary meaning.  Custom Vehicles, Inc. v. Forest River, Inc., 476 F.3d 481, 485-86 (7th Cir. 2007).  Since 2000, plaintiff has sold more than 325,000 units with red knobs, generating more than $800 million in revenue.  The parties do not dispute that this is a significant number of sales for the

17

residential range and rangetop market.

e. Established place in the market

Plaintiff sells and promotes red-knobbed ranges and rangetops throughout the United States, with approximately 2,000 authorized dealers in 50 states. This wide distribution of its products supports a finding that its red knobs have acquired secondary meaning. Defendant contends that the fact that plaintiff sells black-knob ranges and rangetops undermines plaintiff's claim of secondary meaning. However, as stated before, ranges with black knobs account for less than 30% of plaintiff's range and rangetop sales. Also, defendant has provided no evidence that any dealer displays only black knobs on plaintiff's products.

f. Proof of intentional copying

Proof that the defendant or other competitors are intentionally copying plaintiff's trade dress is proof that the trade dress has acquired secondary meaning. From the evidence presented, a reasonable jury could infer that defendant is copying plaintiff's trade dress. Although defendant had information suggesting that consumers were interested in red, green, blue, brass and other colors for knobs, defendant chose to offer only stainless steel, black, white and red knobs, with red and stainless steel knobs being the only new colors offered.

18

A jury could conclude that defendant chose intentionally to offer red as the first of its colored knobs to copy plaintiff's signature red knobs.

Taking all of these factors into consideration, I am persuaded that defendant has not overcome the presumption provided by plaintiff's trademark registration that plaintiff's trade dress has acquired secondary meaning. Even if plaintiff were not entitled to a presumption, it is at least likely that plaintiff can persuade a jury that its red knobs have acquired secondary meaning as a source identifier.

## 2. Confusion

In addition to showing that its mark has acquired secondary meaning, a plaintiff in a trademark infringement suit must demonstrate that the challenged mark is likely to confuse consumers. Barbecue Marx, Inc. v. 551 Ogden, Inc., 235 F.3d 1041, 1043 (7th Cir. 2000). Customer confusion takes various forms, including "initial interest" confusion, "source" or "associational" confusion and "post-sale confusion." Initial interest confusion occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated. Promatek Industries, Ltd. v. Equitrac Corp., 300 F.3d 808, 812 (7th Cir. 2002). This type of confusion is actionable under trademark laws because the defendant "reaps the goodwill" that plaintiff has developed in its mark. Id. Associational confusion occurs when the

19

similarity of the parties' trade dress leads consumers to believe that the two parties are associated in some way. Computer Care v. Service Systems Enterprises, Inc., 982 F.2d 1063, 1070 (7th Cir. 1992). For example, if a customer saw the Toyota trademark on a Honda vehicle, the customer may assume that Toyota and Honda are now affiliated. This type of confusion could damage a plaintiff if consumers are dissatisfied with the defendant's product. Post-sale confusion occurs when a potential customer sees a product bearing the plaintiff's trade dress and mistakenly attributes the product to the plaintiff, thereby influencing his or her buying decision, either positively or negatively. CAE, Inc. v. Clean Air Engineering, Inc., 267 F.3d 660, 683 (7th Cir. 2001); see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co., 799 F.2d 867, 872-73 (2d Cir. 1986) (explaining that, although product labels informed actual buyers in the store about the source of the plaintiff's jeans, similarity in the stitching patterns could cause prospective buyers who saw the jeans outside the store to associate the defendant's jeans with the plaintiff, thereby influencing their buying decision).

"Likelihood of confusion is measured by: (a) similarity of the trade dresses; (b) the area and manner of concurrent use, including the similarity of the products on which the trade dresses are being used; (c) the degree of care likely to be used by consumers; (d) the strength of [the plaintiff's] trade dress; (e) evidence, if any, of actual confusion; and (f) any intent of [the defendant] to pass off its product as that of [the plaintiff]." AM General

20

<u>Corp.</u>, 311 F.3d at 824-25.  "No single factor is dispositive, and courts may assign varying weights to each of the factors depending on the facts presented . . . ."  <u>Packman</u>, 267 F.3d at 643.  Plaintiff is not required to show *actual* confusion, particularly at the preliminary injunction stage.  <u>Computer Care</u>, 982 F.2d at 1070.

a.  Similarity of the trade dress

In determining whether the two marks are similar, the comparison is made  "in light of what happens in the marketplace, not merely by looking at the two marks side-by-side."  <u>Ty, Inc.</u>, 237 F.3d at 898.  However, "the close similarity between the parties' trade dresses in side-by-side comparison is also a factor to be considered in evaluating the likelihood of confusion."  <u>Computer Care</u>, 982 F.2d at 1070 (internal quotations omitted); <u>AM General Corp.</u>, 311 F.3d at 825.  Although defendant contends that its red knobs are obviously a different shape and color from plaintiff's red knobs, I am not persuaded.  (Plaintiff brought the parties' red knobs to the evidentiary hearing.  Plf.'s Hrg. Exh. 5 & 6).  The knobs have a similar shape, size and color.  Only a close examination of the knobs shows their minor differences.  Nothing about these differences would seem important to consumers, and defendant has not pointed to any differences that a consumer would readily identify.  Moreover, confusion could exist if a customer sees bright red knobs on defendant's ranges and believes that the range is plaintiff's or affiliated with plaintiff.

21

b.  The area and manner of concurrent use

This factor includes analysis of the similarity of the ranges and rangetops on which the trade dress is attached and where the ranges and rangetops are displayed for sale.  <u>AM General Corp.</u>, 311 F.3d at 824-25.   Plaintiff has not submitted any evidence, such as customer surveys, to establish whether end-use customers are confused by the similarity in the appearance between Viking and Wolf ranges.  However, the visual similarities between the trade dress, the ranges and market in which the ranges and rangetops are sold can be evidence of confusion.  <u>Computer Care</u>, 982 F.2d at 1070-71.  Both parties sell high-end, commercial style, stainless steel ranges in similar sizes that are frequently sold in the same retail outlet.  Defendant contends that its ranges are very different from plaintiff's ranges in color, shape of feet, grate, window, control panel and logo design, while plaintiff contends that the stainless steel ranges are similar in color, size and shape.  Also, defendant contends that consumers are unlikely to be confused if the ranges are displayed in separate vignettes in a retail store marked clearly with the manufacturer's brand name, while plaintiff contends that consumers might be confused between the two brands if they are displayed in a showroom such as Abt Electronics that displays ranges in long lines with Wolf and Viking ranges side-by-side.  Regardless whether there are distinct differences between the design of the parties' ranges and whether they are displayed in separate vignettes, I agree with plaintiff that the similarities between the parties' red knobs and the consumer markets that they

22

target could lead to possible associational confusion.  Given that plaintiff's red knobs are the major exception to the black and stainless steel knobs that pervade the residential ranges industry, a consumer could believe that any company offering red-knobbed ranges is associated with plaintiff, that plaintiff manufactured the range or that plaintiff acquiesced in the use of the red knobs.

c.  The degree of care likely to be used by consumers

Consumers who use a high level of care when purchasing products are less likely to be confused by a defendant's use of a competitor's trade dress.  Id. at 827-28.  However, a "consumer's high sophistication does not foreclose confusion."  Id.

High-end ranges are relatively expensive.  The parties agree that consumers are likely to use a high degree of care in purchasing one.  Such care may include performing research and visiting appliance dealers multiple times before making a purchase.  A consumer who is investing $2,000-$12,000 on a range is unlikely to buy a range without being sure of the brand, and a quick review of the range itself will tell the customer that.  However, a "consumer's high sophistication does not foreclose confusion," and there are scenarios in which confusion is likely.  Computer Care, 982 F.2d at 1070; see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc., 78 F.3d 1111, 1121 (6th Cir. 1996) ("The relevant question is whether a golfer, albeit sophisticated, would likely be confused about affiliation

23

between the two clubs."). Potential consumers of high-end ranges do not necessarily encounter red-knob ranges for the first time at an appliance retail store where the manufacturer's name is prominently displayed and repeated by a sales representative. Suppose a potential range customer is at a dinner party and the hostess tells the potential customer how much the hostess enjoys her range. The range happens to be a Wolf range with red knobs. Several weeks or months later, when the potential customer enters a retail store to browse ranges, he or she sees a stainless steel Viking range displayed with red knobs that looks similar to the red-knob range he or she has seen in the past. There are no other ranges displayed with red knobs. The customer does not remember the brand of the hostess' range, but the customer knows that Viking is a well-known manufacturer in the high-end range market. The red knobs look familiar, so the customer thinks this is the range to which the hostess spoke so highly. Computer Care, 982 F.2d at 1070 (providing a similar hypothetical regarding when confusion may arise in sophisticated car dealer purchasing computer system). Such a situation could qualify as "initial interest" confusion, because defendant would be reaping the benefit of the goodwill that plaintiff has developed in its mark. Promatek Industries, Ltd.,300 F.3d at 812 (posting a sign with another's trademark in front of one's store constitutes initial interest confusion because "customers believing they are entering the first store rather than the second are still likely to mill around before they leave.").

24

Moreover, associational confusion may still exist where consumers are sophisticated. Even though high-end range consumers might understand that a particular red-knob range is a Viking,  there may be confusion as to whether plaintiff is the manufacturer or affiliated with the manufacturer of the range.

d.  The strength of plaintiff's trade dress

The stronger plaintiff's mark, the greater likelihood of confusion.  As discussed above, plaintiff has offered considerable evidence, particularly in the form of a registered trademark and third party media coverage, that its trade dress has acquired secondary meaning.

e.  Evidence of actual confusion

Given the stage of the case, the record contains no evidence of actual confusion.  The lack of evidence favors neither party because plaintiff does not need to prove actual confusion at this stage.  AM General Corp., 311 F.3d at 829; Bishops Bay Founders Group, Inc., 301 F. Supp. at 913.

f.  Defendant's intent to pass off product as that of plaintiff

As discussed above, a reasonable jury could conclude that defendant chose to offer red knobs because it wanted to undermine the association that consumers have with plaintiff

25

and red knobs or because it wanted customers to believe that plaintiff and defendant are now affiliated.

In sum, the similarity of the trade dress, the fact that plaintiff's and defendant's ranges are sold through similar channels, the strength of plaintiff's trademark and the possibility that defendant is intentionally trying to undermine plaintiff's trademark weigh in favor of finding a likelihood of initial interest or associational confusion. Accordingly, plaintiff has established that it has a more than negligible chance of success of proving both that its red knobs have achieved secondary meaning and that there is a likelihood of confusion with defendant's use of red knobs. I turn now to the three remaining preliminary injunction factors.

## B.  Irreparable Harm

To show irreparable harm, plaintiff must show that any injuries or losses that it will suffer from the denial of an order enjoining defendant from marketing or selling red knobs cannot be compensated in money damages. In cases of trademark infringement, irreparable harm to the trademark owner is generally presumed. Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 469 (7th Cir. 2000); Abbott Laboratories, 971 F.2d at 17,22 (loss of market share in the trademark context can 'render monetary relief inadequate"); Processed Plastic Co. v. Warner Communications, Inc., 675 F.2d 852, 858 (7th Cir. 1982)

26

("[D]amages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law"); <u>Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.</u>, 560 F.2d 1325, 1332 (7th Cir. 1977) (damage to prominence of plaintiff's mark through public confusion is irreparable injury).

## C. <u>Balance of Harms</u>

In evaluating the balance of harms between the parties, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." <u>Girl Scouts of Manitou Council</u>, 549 F.3d at 1086. The hardships are adjusted for the probability of success on the merits. <u>Id.</u>

Defendant has provided little evidence of the harm it will suffer if the injunction is granted or reason for believing that any losses it may suffer could not be readily calculated and compensated, should it prevail ultimately. In contrast, plaintiff asserts that the red knobs are a prominent feature on its products and that it has been using red knobs to distinguish itself for more than 10 years. The balance of hardships weighs in favor of plaintiff.

27

D.  The Public Interest

The "public interest" includes "any effects that granting or denying the preliminary injunction would have on nonparties."  Id.  The nature of the injunction that plaintiff is seeking poses very little if any risk to the public.  Granting the injunction carries out the purposes of federal trademark law and to that extent, fulfills the public's interest.  This factor weighs in plaintiff's favor.

E.  Summary

In sum, plaintiff has demonstrated that (1) it has a likelihood of success on the merits of its trademark infringement claim; (2) it will suffer irreparable injury for which there is no adequate remedy at law if defendant offers red knobs for use on its ranges and rangetops; (3) the harm plaintiff will suffer without an injunction outweighs the harm defendant will suffer with an injunction; and (4) it is in the public interest to avoid potential confusion. Therefore, plaintiff's motion for a preliminary injunction will be granted.

F.  Bond

Fed. R. Civ. P. 65(c) provides that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

28

restrained." The parties may have until February 19, 2010 to submit briefs and evidentiary

materials regarding the appropriate amount for an injunction bond.


ORDER

IT IS ORDERED that

1.  Plaintiff Wolf Appliance, Inc.'s motion for preliminary injunction, dkt. #5, is

GRANTED.  Immediately upon plaintiff's posting of a bond, defendant Viking Range Corp.

is ENJOINED from advertising, promoting, offering or selling red knobs for use with its

ranges and rangetops during the pendency of this case.

2.  The parties may have until February 19, 2010 to submit briefs and evidentiary

materials regarding the appropriate amount for an injunction bond.

Entered this 11th day of February, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

29